Robert A. Bowen and Helen Bowen v. Commissioner. John D'Arcy, Jr. and Marian S. D'Arcy v. Commissioner.
Bowen v. Commissioner
Docket Nos. 35225, 35226.
United States Tax Court
T.C. Memo 1954-101; 1954 Tax Ct. Memo LEXIS 145; 13 T.C.M. (CCH) 668; T.C.M. (RIA) 54207; July 22, 1954, Filed Harry B. Sutter, Esq., One North LaSalle Street, Chicago, Ill., and Ralph E. Davis, Esq., for the petitioners. John L. Pedrick, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for 1949 in the amounts of $754.26 and $811.40 in Docket Nos. 35225 and 35226, respectively. The only question is whether petitioners Robert A. Bowen and John D'Arcy, Jr., realized taxable income in 1949 when each exercised an option to purchase stock from his employer corporation for less than the actual value of such stock. Findings of Fact The stipulation of facts, together with accompanying exhibits, is hereby adopted and incorporated herein by this reference. Petitioners Robert A. Bowen and Helen Bowen, husband and wife, residing in Western Springs, *146 Illinois, filed a joint income tax return for 1949 with the collector of internal revenue at Chicago, Illinois. Petitioners John D'Arcy, Jr. and Marian S. D'Arcy, husband and wife, residing in Geneva, Illinois, filed a joint income tax return for 1949 with the collector of internal revenue at Chicago, Illinois. Robert A. Bowen and John D'Arcy, Jr. will sometimes hereinafter be referred to as "Bowen" and "D'Arcy", respectively. Bowen since 1946 and D'Arcy since 1939 have been employees of the Quaker Oats Company, a corporation engaged in milling and manufacturing cereal products. In 1949 Bowen was Assistant Controller and D'Arcy was Assistant General Operating Manager of the Company. On September 21, 1945, the Board of Directors of the Company recommended to the shareholders that they approve a plan providing for the sale of the Company's common stock to certain of its officers and employees. The proposed plan contained a denial that it was to provide additional compensation, and asserted that its purpose was to arrange for the employees in managerial positions who were not then holders of a substantial amount of stock "to acquire proprietary stock interest in the Company." Under *147 the proposed plan the Board of Directors was authorized to provide for the allotment of options to purchase common stock of the Company to a group of officers and managerial employees of the Company and its subsidiaries. The Board was to appoint, from its members, a committee to determine the employees to whom options would be offered and the number of shares offered to each officer or employee. Members of the committee were not eligible to participate under the plan. A total of not more than 50,000 shares of authorized but unissued common stock of the Company could be issued, allotted and offered under the plan. The purchase price under options granted prior to January 1, 1947, was to be $55 per share, and for options granted after that date the purchase price was to be a price fixed by the Board of Directors but not less than $55 per share. All options were to expire on June 30, 1951. Under the proposed plan the Board of Directors was authorized to establish a loan program whereby it would be possible for an employee to pay a portion of the purchase price in cash and to give notes, with the stock pledged as collateral, for the balance. Under the plan as adopted by the Board of Directors *148 it was not intended that all of the 50,000 shares should be allotted immediately but that a portion of the shares would be held available for making future allotments. It was contemplated by the Board of Directors that allotments would be made to between 150 and 200 individuals; that the number of shares allotted to any individual would be divided in five equal parts, each part becoming available in successive twelve month periods following the date of the allotment. The Board of Directors further contemplated that the option agreements would contain substantially the following provisions: Termination of employment in any manner would automatically cancel any unexercised option. The right of the employee to purchase would be exercised by the employee during the designated periods and while the optionee was an employee of the Company in good standing. Under date of October 3, 1945, there was sent to the stockholders a proxy statement in connection with the annual meeting to be held on November 2, 1945. The proxy statement contained a copy of the foregoing plan together with a statement of contemplated procedure, which are summarized in part in the preceding paragraph, and which are *149 incorporated herein in full as part of the stipulation of facts. It was contemplated that the original committee to make allotments under the plan would be John Stuart, Chairman of the Board of Directors, R. Douglas Stuart, President, and Edward L. Ryerson, a director, who was not a salaried employee and who was Chairman of the Board of Inland Steel Company. Also under date of October 3, 1945, John Stuart and R. Douglas Stuart, Chairman of the Board and President, respectively, of the Company wrote a joint letter to the common stockholders of the Company with regard to the proposed Employees' Stock Purchase Plan. In the letter they stated that throughout the many years of the Company's existence the senior officers who directed the Company's affairs had always had a substantial stock interest. They pointed out that the older group was gradually retiring; that the younger group which was taking over management held practically no stock in the Company; and that they believed that the Plan would be of great benefit to the Company in that it would aid materially in holding key men, weld the management employees together and provide a common interest on the part of management with the *150 stockholders whose interests they manage. They also stated that the stock was to be offered to selected employees at a price which, in the light of earnings and market quotations over recent years, would seem relatively safe for the placement of funds by the employees. At the annual meeting of the stockholders of the Company held on November 2, 1945, the Plan, in the same form as described in the proxy statement of October 3, 1945, was adopted. Approximately 98 per cent of the stock present at the meeting voted in favor of the Plan; less than two per cent against the Plan. Although the Plan was approved, as aforesaid, in 1945, the Board of Directors did not put it into effect until 1949. During that interval unsuccessful efforts were made to obtain a ruling from the Bureau of Internal Revenue that the purchase of stock under the Plan would not result in the receipt of taxable income by the employees. Also, negotiations were had with the Securities and Exchange Commission relating to the necessity of a registration statement in connection with the stock to be offered under the Plan. The Board of Directors of the Company, at its meeting held on August 19, 1949, directed that the *151 Employees' Stock Purchase Plan be placed in effect. John Stuart, Chairman of the Board, R. Douglas Stuart, President, and Edward L. Ryerson, persons not qualified to participate under the Plan, were appointed as a committee to determine the employees who were to be offered options and the number of shares to be offered to each. Options were to be offered to no more than 75 employees and the aggregate number of shares offered was not to exceed 25,000. The Board set the option price at $65 per share, payable not less than $1 per share at the time of the exercise of the option and the balance over a period of ten years. Notes covering the balance due were to bear interest at the rate of 2 1/2 per cent per annum. All options were to expire on March 31, 1950. The resolution adopted by the Board of Directors at its meeting on August 19, 1949, stated that the Securities and Exchange Commission had indicated that stock could be offered under the Plan to a limited number of employees without the necessity of registration of such stock with the Securities and Exchange Commission and that the Employees' Stock Purchase Plan authorized by the stockholders at the annual meeting held November 2, 1945, be *152 placed in effect upon the receipt of opinion of counsel that the offering of the stock would not require registration under the Securities Act of 1933. The employees who were to participate in the Plan were selected by the committee named by the Board of Directors. The committee granted options to those employees who had proven themselves in the past and indicated from their past performance that they would carry responsibilities and who had the best possibility of "coming through and being promoted into more important positions." In selecting employees to be granted options the committee considered the manner in which the employee was then carrying his assigned responsibilities, the employee's performance of his duties, his interest in his work, and the judgment of the committee as to his "ability to move on to higher responsibilities." In determining the number of shares to be optioned to each employee the committee grouped the employees according to the amount of salary and bonus received by each, and set quotas of shares to be optioned on that basis to the various employees. The committee made no inquiry as to the financial condition of any of the employees awarded options, but *153 it felt that salary and bonus furnished a suitable guide in determining how much each employee could purchase "without undue hardship on his family or himself". The committee cautioned each optionee-employee not to exercise his option for more shares than he could expect to hold and to pay for without undue hardship on his family or himself. In fixing the price at which the employees would be permitted to buy the stock, the Directors took into account book values and the range of the market prices for the stock for years prior to 1945. In selecting the initial price of $55 per share in 1945 the Directors felt that the market price would not go below such figure. The price of $65 per share fixed in 1949 was arrived at on much the same basis except that it took into account increases in earnings of the Company and in the book value of the stock. The Company desired to sell the stock to the employees at a price which would represent a relatively safe investment and at a price which had very little chance of being below future market prices. In addition, the Company arranged for the employees to pay for the stock on the installment basis with interest at a low rate of 2 1/2 per cent *154 per annum, which was the same interest rate as the Company was paying on its own borrowings, benefits which the employees could not have obtained had they acquired the stock on the open market. The shares of common stock which were to be allotted under the Plan were theretofore authorized but unissued shares of the Company. Under date of October 20, 1949, petitioner Robert A. Bowen received a letter from the Company granting him an option to purchase 95 shares of the common stock of the Company at $65 per share. The letter stated that the option was personal to him and that, to the extent unexercised, it would expire on March 31, 1950, his earlier death or the termination of his employment with the Company. The letter further stated that Bowen could exercise his option by delivering to the Treasurer of the Company the following: (1) a signed statement of his election to exercise the option in whole or in part and of his intention to make the purchase for investment and not for resale; (2) payment of 15 per cent of the difference between the option price and the fair market value on the date of exercise, as income tax withheld; and (3) payment for the stock at $65 per share in cash *155 or installments. Petitioner D'Arcy received a similar letter from the Company granting him an option to purchase 100 shares of the common stock of the Company. On the same date, October 20, 1949, options were granted to 55 other employees of the Company, making a total of 57 to whom options were granted. The number of shares offered to the employees ranged from 20 to 1,000. The employees granted options included all the officers of the Company other than the two senior officers who were members of the committee and ineligible to participate. Of the 11 officers of the Company granted options, nine officers were allocated 1,000 shares each, one was allocated 300 shares and another was allocated 125 shares. Six of such employees exercised no portion of the option granted to them. Other employees exercised only a portion of their option. Eighteen of the employees who were granted options on October 20, 1949, exercised such options in whole or in part in the year 1950. Under date of October 20, 1949, petitioners Robert A. Bowen and John D'Arcy, Jr., as well as all other employees to whom options were granted, each received an identical letter from John Stuart, Chairman of the Board *156 of the Company, with respect to the Employees' Stock Purchase Plan, together with a memorandum dealing with the Federal income tax effects of the exercise of the stock options. The history of the Plan and the details of its operations were set forth. It was pointed out that the transaction was to be highly confidential between the employee and the Company, and the employee was told that it would be considered a serious error in judgment if he divulged the information beyond his family circle. The letters further stated as follows: "When you have considered carefully the details of the plan, you will find that the intention of the plan is to permit you to acquire a continuing stock ownership interest in the company and not to give you any market advantage of a temporary nature. You should not exercise your option for more stock than you can expect to hold and to pay for without hardship. "Under no circumstances should you feel that you are obligated to exercise any part of this option; your decision should depend on your own individual affairs. The company does not wish to be in the position of urging or even recommending the purchase. Each man will have to decide for himself, and *157 in no way will your position with the company be affected if you feel that you are unable to exercise any part of this option." The options were not granted to Bowen or D'Arcy at their request or demand, nor were they or either of them negotiating an employment contract with the Company at the time their options were granted, at any time prior thereto or at any time thereafter. On December 2, 1949, petitioner Robert A. Bowen delivered to the Company an instrument in writing in which he stated that he desired to exercise his option to purchase 95 shares of common stock of the Company and that he was purchasing the stock for investment and not for resale. At the same time Bowen paid to the Company $488.95, represented to be the estimated amount of income tax which the Company stated it was obliged to withhold on the transaction. He also delivered to the Company $95 in cash and his promissory note in the amount of $6,080, to cover the purchase price of the stock at $65 per share. Under the terms of said promissory note Bowen was to pay $95 on or before September 15, 1950, $285 on or before September 15, 1951, and $712.50 on or before the 15th day of each September thereafter until *158 the note was fully paid, with interest on the principal balance from time to time unpaid at the rate of 2 1/2 per cent per annum. The note further provided that it would immediately become due and payable upon default of payment of any installment of principal or interest, or upon the death or termination of Bowen's employment with the Company. The note was secured by a pledge of the stock acquired through the exercise of the option. On October 28, 1949, petitioner John D'Arcy, Jr., delivered to the corporation an instrument in writing in which he stated that he desired to exercise the option granted to him to purchase 100 shares of common stock of the Company and that he was purchasing the stock for investment and not for resale. At the same time he paid to the corporation $504.38, represented to be the estimated amount of income tax which the Company stated it was obliged to withhold on the transaction. At the same time petitioner also delivered to the Company $100 in cash and his promissory note in the amount of $6,400 to cover the purchase price of the stock at $65 per share. The promissory note, which was secured by a pledge of the stock acquired through the exercise of the *159 option, provided that D'Arcy was to pay $100 on or before September 15, 1950, $300 on or before September 15, 1951, and $750 on or before the 15th day of each September thereafter until fully paid, with interest on the principal balance from time to time unpaid at the rate of 2 1/2 per cent per annum. D'Arcy's note also provided that it would become due and payable immediately upon default of payment of any installment of principal or interest or upon termination of his employment with the Company or upon his death. Neither Bowen nor D'Arcy has disposed of any of the shares of common stock acquired by him through exercise of his option. During the year 1949 and all subsequent years the Company had in effect bonus plans which provided for additional compensation to employees beyond their basic salaries or wages by participation in the earnings of the Company. Senior executives of the Company were included in an executive bonus plan which was based upon a percentage of earnings after preferred dividends, wage and staff bonuses, and after deducting six per cent on the common stockholders' equity in the business. During the year 1949 four officers of the Company participated in the *160 executive bonus distribution. Officers covered by the executive bonus plan did not participate in any other bonus. During 1949 the Company had in effect a Staff Bonus Plan covering management employees and based upon a percentage of the Company's earnings determined by the Board of Directors after payment of preferred dividends and before taxes. The Staff Bonus Plan was adopted by the Company to give management employees more than just a salary interest in the Company. The Company tried to keep its salary base low from a competitive standpoint and thought that the Staff Bonus Plan would produce a type of partnership arrangement between the Company and the management employees. During the year 1949 about 200 management employees participated in the Staff Bonus. Awards of the bonus were made by a special committee of senior officers who did not participate in the bonus. In awarding the Staff Bonus the participating employees were divided into groups and the amount of the bonus for each employee determined with reference to a base amount for each group. Other employees were covered by a wage bonus plan which was based upon a fixed percentage of the Company's earnings and distributed *161 on a basis of a percentage of the annual earnings of the respective employees. None of the Company's bonus plans was changed by reason of the granting of the options. The options to purchase stock were not granted as a substitute for or in lieu of all or any portion of the bonus. During the year 1949 and all subsequent years the Company had in effect a Retirement Plan. The employees to whom options to purchase stock were granted were among those eligible to participate under this Retirement Plan. The Retirement Plan was amended in 1951 to increase the benefits to all covered employees. The options to purchase stock were not granted as a substitute for or in lieu of any or all of the benefits under the Retirement Plan. During the year 1949 the Company established a Group Life Insurance Plan which covered all employees, including the employees to whom options to purchase stock were granted. The Group Life Insurance Plan was modified in 1953 to increase substantially the benefits to the employees. The options to purchase stock were not granted as a substitute for or in lieu of any or all of the benefits under the Group Life Insurance Plan. Attached to the joint income tax return *162 of the Bowens for 1949 was a rider which read as follows: "During 1949 cash compensation of $12,379.99 was received from The Quaker Oats Company, Chicago, Illinois, from which income tax of $1,438.80 was withheld. "On December 2, 1949, Taxpayer purchased from his employer, The Quaker Oats Company, 95 shares of the theretofore authorized but unissued common stock of such employer for $6,175.00, at which time the quoted value of common stock on the New York Curb Exchange was $9,434.69, the spread between these two amounts being $3,259.69. Based upon this spread of $3,259.69, The Quaker Oats Company collected $488.95 from Taxpayer as withheld income tax. Taxpayer has not included such spread of $3,259.69 as income under Item 2 on the face of the attached return because in his opinion it does not constitute compensation or income, being only unrealized appreciation on a bargain purchase. ( Geeseman v. Commissioner, 38 B.T.A. 258 (1938), Acq. 1939-1 C.B. 13; Nicolson v. Commissioner, 13 T.C. 690, (1949))." A similar rider was attached to the joint income tax return of the D'Arcys for 1949. The rider attached to petitioners' returns for the *163 year 1949 was not the result of any independent investigation of the tax laws by either of petitioners Robert A. Bowen or John D'Arcy, Jr., but was furnished them by regularly employed counsel for the Company. In his audit of the income tax return of the Bowens for the calendar year 1949, respondent asserted that Robert A. Bowen realized taxable income in the amount of $3,259.69, represented by the difference between the fair market value of 95 shares of common stock of The Quaker Oats Company ($9,434.69 or $99.3125 per share) on December 2, 1949, the date the stock was issued to him, and the amount of the option price ($6,175 or $65 per share) paid for the stock by him. By reason thereof respondent determined a deficiency in income taxes against the Bowens for the calendar year 1949 in the amount of $754.26. In his audit of the income tax return of the D'Arcys for the calendar year 1949, respondent asserted that John D'Arcy, Jr. realized taxable income in the amount of $3,362.50, represented by the difference between the fair market value of 100 shares of common stock of The Quaker Oats Company ($9,862.50 or $98,625 per share) on October 28, 1949, the date the stock was issued *164 to him, and the amount of the option price ($6,500 or $65 per share) paid for the stock by him. By reason thereof respondent determined a deficiency in income taxes against the D'Arcys for the calendar year 1949 in the amount of $811.40. At a meeting of the Executive Committee of the Company on December 27, 1949, it was resolved that, notwithstanding the view that the sale of stock to employees under the Plan was not taxable income to such employees, the proper officers of the company be directed to reflect in the Company's income tax returns that it was taking a deduction with respect to such sale and was collecting the withholding tax only because of requirements of existing Treasury regulations. The minutes of the meeting record the Chairman as stating that the purpose of the Plan was not to furnish compensation for services, but rather to secure to the Company the benefits of placing a proprietary interest in officers and managerial employees and of stimulating the interest of such officers and employees in the affairs of the Company. The resolution of the committee contains a similar recital. In its income tax return for the year ended June 30, 1950, the Company claimed a deduction *165 for employee stock option expense in the amount of $462,221.25, and attached a rider to the return explaining the deduction in accordance with the resolution of the executive committee summarized above. In connection with his review of the Company income tax liability for such year, respondent requested the Company to execute Form 872, Consent Fixing Period of Limitation upon Assessment of Income and Profits Tax, such consent being limited "solely to assessment in tax, if any, in respect to a deduction taken under the classification of stock option expense in the amount of $487,254.38, claimed under the provisions of Section 29.22(a)1, Regulations 111, amended by T.D. 5507, and shall not be effective for any other purpose whatsoever." The Company and respondent executed such consent under date of August 31, 1953. Upon the exercise of an option by an employee, the transaction was reflected on the books of account of the Company in the following manner: The market price of the stock was credited to an account entitled "Capital Stock - Common"; the sales price of the stock was debited to an account entitled "Accounts Receivable - Officers and Employees - Secured"; and the *166 difference between the market price and the sales price of the stock was debited to an account entitled "Stock Option Expense". The Company filed a Form W-2a, Withholding Statement - 1949, for Robert A. Bowen, which reported alleged wages in the amount of $3,259.69, and on which there was withholding of income taxes of $488.95 and a similar statement for John D'Arcy, Jr., which reported alleged wages in the amount of $3,362.52, and on which there was withholding of income taxes of $504.38 with respect to the stock options exercised by them in 1949, respectively. On each such Form W-2a the following statement appeared: "Attributable to employee's bargaining purchase of stock from employer. Reported as compensation under protest." During the calendar year 1949, the year in which the option was granted to Robert A. Bowen and the year in which he exercised the option, Bowen received a basic salary of $8,699.99 and a cash bonus of $3,680 from the Company. The total basic salary and cash bonus amounting to $12,379.99, was $2,313.32 more than the total amount of basic salary and cash bonus he received from the Company during the calendar year 1948 when he was paid a basic salary of *167 $7,666.67 and a cash bonus of $2,400. During the calendar year 1950 the Company paid Bowen a total basic salary and cash bonus of $15,149.98, consisting of $9,949.98 basic salary and $5,200 cash bonus. This was $5,083.31 more than the aggregate of basic salary and cash bonus he received in 1948 and $2,769.99 more than he received in such form in 1949. In each of the calendar years 1951 and 1952 the aggregate for each year of the basic salary and cash bonus paid Bowen by the Company exceeded corresponding payments received by Bowen in the preceding calendar year. During the calendar year 1949, the year in which the option was granted to John D'Arcy, Jr. and the year in which he exercised the option, D'Arcy received a basic salary of $8,599.99 and a cash bonus of $4,600 from the Company. The total basic salary and cash bonus amounting to $13,199.99 was $2,999.99 more than the total amount of basic salary and cash bonus he received from the Company during the calendar year 1948 when he was paid a basic salary of $7,800 and a cash bonus of $2,400. During the calendar year 1950 the Company paid D'Arcy a total basic salary and cash bonus of $16,979.96, consisting of $9,699.96 basic salary *168 and $7,280 cash bonus. This was $6,779.96 more than the aggregate of basic salary and cash bonus he received in 1948 and $3,779.97 more than he received in such form in 1949. In each of the calendar years 1951 and 1952 the aggregate for each year of the basic salary and cash bonus paid D'Arcy by the Company exceeded corresponding payments received by D'Arcy in the preceding calendar year. The total compensation paid by the Company to each employee to whom an option to acquire common stock was granted in October, 1949, was greater in 1949 and 1950 than was paid to such employee for his services in 1946, 1947 or 1948. In fixing the basic salary and bonus payable to Bowen and D'Arcy and other officers and employees to whom options were granted in 1949, neither the granting of such options, nor the exercise thereof by the employee, was taken into account by the Company. The granting of the options was treated as confidential between the committee and the individual so that even the immediate supervisor of the employees in his department did not know whether the employee had been allotted shares under the Plan. On November 2, 1945, and at all times prior to the granting of employee *169 stock options the capital structure of the Company, respecting its common stock, was as follows: Authorized
Issued
Outstanding
800,000
702,000
699,553 *
During 1945 and continuously thereafter through the period here involved the common stock of the Company was traded on the New York Curb Exchange. The yearly range of market prices for the common stock of the Company during the years 1945 through 1950 was as follows: Year
High
Low
1945
107
76 1/2
1946
114
90 1/2
1947
96
85
1948
96
79
1949
112
85 1/4
1950
137 7/8
95
The net earnings of the Company per share of common stock and dividends paid per share of common stock for the fiscal years ended June 30, 1945 through June 30, 1950, are as follows: Net Earnings
Dividends
Year
Per Share
Per Share
1945
$ 6.18
$3.75
1946
7.71
3.75
1947
9.84
4.50
1948
10.52
4.50
1949
10.15
5.50
1950
12.52
5.75
On September 21, 1945, the date on which the Board of Directors adopted a resolution recommending the adoption of an Employees' Stock Option Plan, the fair market value of the common stock of the Company *170 was $91.25 per share. On November 2, 1945, the date on which the Employees' Stock Option Plan was approved by the common shareholders of the Company, the fair market value of the common stock was $99 per share. On August 19, 1949, the date on which the Board of Directors resolved to put the Employees' Stock Option Plan into effect, the fair market value of the common stock was $98.50 per share. On October 20, 1949, the date employee stock options were granted to Bowen and D'Arcy, and to 55 other officers and employees, the fair market value of the common stock was $99.38 per share. On December 21, 1949, the date on which Bowen exercised his option to purchase 95 shares of common stock of the Company at a price of $65 per share, the fair market value of such stock was $99.3125 per share and the total amount of the difference between the price paid by Bowen for the 95 shares and the fair market value was $3,259.69. On October 28, 1949, the date on which D'Arcy exercised his option to purchase 100 shares of common stock of the Company at a price of $65 per share, the fair market value of such stock was $98.625 per share and the total amount of the difference between the price *171 paid by D'Arcy for the 100 shares and their fair market value was $3,362.50. Although some of the officers and employees awarded stock options on October 20, 1949, owned stock in the Company prior to that time, the committee which awarded the options did not take such prior stockholdings of any of the employees into account in determining the number of shares included in any option; however, the committee knew generally that these employees were not substantial stockholders. The committee did not believe that the esprit de corps of the Company's organization would be maintained if in awarding the options it had discriminated against employees who already owned stock. Employees who were awarded options were advised to keep the fact confidential since it was felt that there were other employees who were not awarded options and who considered themselves to be equally deserving. From the standpoint of opportunity for promotion of employees of the Company it made no difference whether the employees receiving options purchased stock. On April 12, 1950, the Company granted stock options to 31 employees under the same terms and conditions as the options granted on October 20, 1949. The *172 number of shares covered by the options granted on April 12, 1950, varied from 65 to 210 shares and were not granted to any of the employees or officers who received options on October 20, 1949. Opinion RAUM, Judge: The essential facts herein do not differ from those in Philip J. LoBue, 22 T.C. 440, although there are many differences in the details. We are satisfied that a different result could not fairly be reached in the present cases. Accordingly, Decisions will be entered for the petitioners. Footnotes
*. 2,447 shares held in Treasury.↩